WILLIE LEE BROOKS,II, #: P16665
Name and Prisoner/Booking Number

CALIFORNIA HEALTH CARE FACILITY
Place of Confinement

P.O. BOX 213040
Mailing Address

STOCKTON, CA 95213
City, State, Zip Code

**FILED**

Feb 02, 2023

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**(Failure to notify the Court of your change of address may result in dismissal of this action.)**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

WILLIE LEE BROOKS,II
(Full Name of Plaintiff)                  Plaintiff,

v.

(1) RAINELLE SMITH
(Full Name of Defendant)

(2) JOHN DOE #1

(3) JOHN DOE #2

(4) PATRICK COVELLO
                         Defendant(s).

☐ Check if there are additional Defendants and attach page 1-A listing them.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. 2:22-CV-00062-DMC-P
(To be supplied by the Clerk)

**JURY TRIAL DEMANDED**
**CIVIL RIGHTS COMPLAINT**
**BY A PRISONER**

☒ Original Complaint
☐ First Amended Complaint
☐ Second Amended Complaint

There is a Liberty Interest
at stake.

## A. JURISDICTION

1.   This Court has jurisdiction over this action pursuant to:

☒ 28 U.S.C. § 1343(a); 42 U.S.C. § 1983

☐ 28 U.S.C. § 1331; Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388 (1971).

☒ Other: 28 U.S.C. § 1367, Chapter 85, Dist. Jurisdiction §§ 1330-1389.

2.   Institution/city where violation occurred: Mule Creek State Prison

## B. DEFENDANTS

1. Name of first Defendant: **RAINELLE SMITH**. The first Defendant is employed as: **Psychologist** at **Mule Creek State Prison**.
   (Position and Title)                                        (Institution)

2. Name of second Defendant: **JOHN DOE #1**. The second Defendant is employed as: **Lieutenant** at **Mule Creek State Prison**.
   (Position and Title)                                        (Institution)

3. Name of third Defendant: **JOHN DOE #2**. The third Defendant is employed as: **Senior Register Nurse** at **Mule Creek State Prison**.
   (Position and Title)                                        (Institution)

4. Name of fourth Defendant: **PATRICK COVELLO**. The fourth Defendant is employed as: **Warden** at **Mule Creek State Prison**.
   (Position and Title)                                        (Institution)

**If you name more than four Defendants, answer the questions listed above for each additional Defendant on a separate page.**

## C. PREVIOUS LAWSUITS

1. Have you filed any other lawsuits while you were a prisoner?   ☒ Yes   ☐ No

2. If yes, how many lawsuits have you filed? **1**. Describe the previous lawsuits:

   a. First prior lawsuit:
      1. Parties: **WILLIE LEE BROOKS II** v. **PATRICK COVELLO, et al**
      2. Court and case number: **2:20-cv-1573-WBS-DMC-P**.
      3. Result: (Was the case dismissed? Was it appealed? Is it still pending?) **Dismissed.**

   b. Second prior lawsuit:
      1. Parties: _____ v. _____
      2. Court and case number: _____.
      3. Result: (Was the case dismissed? Was it appealed? Is it still pending?) _____

   c. Third prior lawsuit:
      1. Parties: _____ v. _____
      2. Court and case number: _____.
      3. Result: (Was the case dismissed? Was it appealed? Is it still pending?) _____

**If you filed more than three lawsuits, answer the questions listed above for each additional lawsuit on a separate page.**

**D. CAUSE OF ACTION**

**CLAIM I**

1. State the constitutional or other federal civil right that was violated: Eighth Amendment - Deliberate Indifference .

2. **Claim I.** Identify the issue involved. Check **only one**. State additional issues in separate claims.
   - ☐ Basic necessities
   - ☐ Mail
   - ☐ Access to the court
   - ☒ Medical care
   - ☐ Disciplinary proceedings
   - ☐ Property
   - ☐ Exercise of religion
   - ☐ Retaliation
   - ☐ Excessive force by an officer
   - ☐ Threat to safety
   - ☐ Other: _____

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Claim I. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

On Saturday, June 19, 2021, RAINELLE SMITH, Psychologist at Mule Creek State Prison (MCSP), after a Crisis Intervention Team (CIT). And me telling her "I'm going to hang myself" more than four times. She said "I'm sending you back." I replied "did you hear what I said, I'm going to hang myself." if you you send me back." Dr. SMITH said "ya-well it's documented, he's good to go back." (To my housing unit)

On Wednesday, June 23, 2021, four days latter, I was back in a safety cage, before another CIT. This time the Psychologist was LISA RICHARDS, Post Doc Intern. Who refered me to a higher layer of care in the crisis-bed on a suicide-watch, at California Medical Facility. (Vacaville).

On Thursday, July 08, 2021, I returned to MCSP, with no Mental Health followup, to my housing unit, Facility-D-A section, Cell 203-Low.

(SEE ATTACHED-CONTINUE-3-A).

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).
Hung myself, on 7-16-2021, caused neck and back injuries. By Defendant, refusing on 7-15-21, to place Plaintiff on suicide watch.

5. **Administrative Remedies:**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution?  ☒ Yes  ☐ No
   b. Did you submit a request for administrative relief on Claim I?  ☒ Yes  ☐ No
   c. Did you appeal your request for relief on Claim I to the highest level?  ☒ Yes  ☐ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____
   _____.

3

1    On Thursday, July 15, 2021, I was back again in the
2    crisis cage and Dr. RAINELLE SMITH, Psychologist, who had refused
3    to put me in the crisis-bed on Saturday, June 19, 2021. Was
4    again part of the CIT. And under four-minutes she said
5    "he's good to go back." I replied "did you hear what I
6    said, if you send me back I'm going to hang myself."
7    Dr. SMITH, responded "ya-ya-ya, we heard that before, well
8    if you do, it's well documented. Send him back, he's
9    low risk." As Dr. SMITH walked out, she laughed and
10   high-fived one of the Custody Staff as she walked
11   out the door. Defendant acted under color of state law.

12
13       At 21:46, hours D-Program Office, after Dr. SMITH,
14   refused to put me in the crisis-bed. The Lieutenant,
15   stated to his officers. "Leave him in there (the safety
16   cage), then when Yard and Dayroom is over. Take him
17   back handcuffed, then send him up to his cell and
18   make sure he looks the door behind him. Then he'll
19   be someone elses problem on 2nd/Watch tomorrow."
20   And that's what was done with me on July 15, 2021.

21
22      On Friday, July 16, 2021, at 9:04 am first thing the
23   next morning. I hung myself from the upper rail of
24   the second tire, using a prison sheet. After 31, seconds
25   I was cut-down, and sent out Code-II, to Sutter
26   Hospital, Emergency Room-Trauma Center. I was in
27   the hospital four days. Then returned to MCSP, with NO
28   mental Health followup.

3-A

**CLAIM II**

1. State the constitutional or other federal civil right that was violated: Eighth Amendments Deliberate Indifference with Cruel and Unusual Punishment.

2. **Claim II.** Identify the issue involved. Check only one. State additional issues in separate claims.
   - ☐ Basic necessities
   - ☐ Disciplinary proceedings
   - ☐ Excessive force by an officer
   - ☐ Mail
   - ☐ Property
   - ☐ Threat to safety
   - ☐ Access to the court
   - ☐ Exercise of religion
   - ☐ Other:
   - ☒ Medical care
   - ☐ Retaliation

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Claim II. Describe exactly what each Defendant did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

John Doe #1, Lieutanant, Custody member of the Crisis Intervention Team (CIT), on Thursday, July 15, 2021, at Facility D-Program Office, at approximately 2146 hours, John Doe #1, agreed with Dr. Smith, that Plaintiff did not represent any risk of suicide or self harm. And he agreed I should return to the housing unit, Building #18-Cell #203. Defendant John Doe #1, acted under color of State Law.

John Doe #1, Lieutanant, as a California Department of Corrections And Rehabilitation (CDCR) Custody Staff member, is required to and has extensive training in suicide prevention. Each CIT member endorsed the suicide prevention and self harm mental health treatment plan, for Plaintiffs safety.

After Dr. Smith, refused along with the CIT, to put me in the Mental Health Crisis Bed, around the clock safety observation, John Doe #1, stated to his officer, "leave him (Plaintiff) in there (the safety cage) than when Yard and Dayroom is over. Take him back handcuffed, than send him up to his cell and make sure he locks the door behind him. Then he'll be someone elses".

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).

By refusing on 7-15-21, to place Plaintiff on suicide watch. On 7-16-21, Plaintiff hung himself, his neck and back was injuried.

5. **Administrative Remedies.**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution? ☒ Yes ☐ No
   b. Did you submit a request for administrative relief on Claim II? ☒ Yes ☐ No
   c. Did you appeal your request for relief on Claim II to the highest level? ☒ Yes ☐ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not.

4

1  problem on 2nd-Watch tomorrow." The officer
2  followed the Lieutenant, John Doe#1, ordereds.
3    Responsibility of Employees: "Every employee,
4  regardless of his or her assignment, is responsible
5  for the safe custody of the inmates confined in the
6  institutions of the department." This includes safety
7  from self-harm.
8    On Friday, July 16, 2021, at approximately 0904
9  hours, Building #18, Facility-D, A-section, Plaintiff
10  hung himself from the second tier upper guard
11  rail, using a prison sheet, and was cut-down by
12  Building #18, Custody Staff. Then was taken by
13  Ambulance to Sutter Amador Hospital-Code-2:
14  Emergency Room. Where I received morphine for
15  serious pain in my neck and back.
16    Dr. Doman noted in the Self Harm report,
17  that this was a "suicide attempt"; it was rated at
18  "1" with minor and superficial injuries." But Plaintiff
19  had serious nerve damage in his neck and
20  back on the CT and MRI, scans.
21    John Doe#1, as part of the CIT, authorized and
22  assisted Defendant R.SMITH's, wrongful acts, by
23  failing to comply with CDCR-15.CCR.Sections 3270,
24  General Policy, 3271 Responsibility of Employees,
25  and Chapter 10, Suicide Prevention and Response,
26  Mental Health Services Delivery System.
27    By assisting Dr. SMITH, who did not provide
28  adequate Mental Health medical treatment, and

1  safety from self-harm. Defendant, John Doe #1, knowingly
2  sent Plaintiff, back into a dangerous situation of suicide
3  and self-harm.

4      John Doe #1, actions on July 15, 2021, acknowledging
5  Plaintiff's, imminent danger of suicide by ordering his Officers
6  leave Plaintiff, in the safety cage until Yard, Dayroom, and all
7  inmates out of the cell activities were over for that day.
8      Then said "return him to his housing unit handcuffed
9  and remove them, then send him up to his cell and make sure
10 he locks the door behind him. Then he'll be someone elses problem
11 on 2nd/Watch tomorrow." By doing so John Doe #1, acknowledged that
12 Plaintiff was in grave danger (threatening great self-harm and
13 danger of suicide) at that time. And did nothing to prevent it or
14 took any appropriate precautions or procedures for suicide
15 watch, due to self-injurious behaviors and suicidal ideations.
16      John Doe #1, knew and believed at that time, Plaintiff, would
17 indeed hang himself that night. His inactions to place Plaintiff, on
18 suicide watch, as required of him under State Law, actually
19 contributed in causing Plaintiffs, suicide attempt.
20      CDCR, rules require that staff who work with people in
21 prison be trained to recognize the signs of suicide risk, which John
22 Doe #1, did recognize, by his own actions. And had a duty upon R. SMITH's,
23 failure to put Plaintiff, on suicide watch as required by, 15 CCR §3365.
24      As an approximate and foreseeable result, John Doe #1, was as a
25 member of the of the CIT, was required then to notify a licensed
26 Physician, to order placement of Plaintiff, on suicide precaution in
27 the Mental Health Crisis Bed on suicide watch as required
28 by CDCR Suicide Prevention Policy and State Law.

                    - 4.B -

**CLAIM III**

1.   State the constitutional or other federal civil right that was violated: Eighth Amendment. Deliberate Indifference with Cruel and Unusual Punishment.

2.   **Claim III.** Identify the issue involved. Check only one. State additional issues in separate claims.

☐ Basic necessities          ☐ Mail          ☐ Access to the court          ☒ Medical care

☐ Disciplinary proceedings          ☐ Property          ☐ Exercise of religion          ☐ Retaliation

☐ Excessive force by an officer          ☐ Threat to safety  ☐ Other: _____.

3.   **Supporting Facts.** State as briefly as possible the FACTS supporting Claim III. Describe exactly what each Defendant did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

John Doe #2, a Senior Registered Nurse, on Thursday, July 15, 2021, at approximately 2196 hours, Facility-D Program Office, as the Nursing member of the CIT. John Doe #2, agreed with Dr. Smiths evaluation of Low Risk of suicide and self harm for Plaintiff, stating "I agree, he should be seen by Psychiatry on the yard." John Doe #2, documented as part of the CIT, that Plaintiff, was not in any danger of self harm. As a CDCR, Senior Registered Nurse (SRN) John Doe #2, has special training as a Nursing Senior and CIT member, in prisoners suicide prevention. John Doe #2, acted under color of State law, when he agreed to send Plaintiff, back to the housing unit and not to the Mental Health Crisis Bed, for 24 hours a day safety observation as required by CDCR's, suicide prevention policy and procedures. On Friday, July 16, 2021, at approximately 0904 hours, Plaintiff, hung himself from the second tier upper guard rail using a prison sheet. Was cut-down and taken Code-1, by Ambulance to Sutter Amador Hospital.

4.   **Injury.** State how you were injured by the actions or inactions of the Defendant(s).

By failing as a CIT member and a Senior Nurse, to put Plaintiff, on suicide watch. The next morning Plaintiff, tried to kill himself my hanging. John Doc #2, is a Register Nurse.

5.   **Administrative Remedies.**

a.   Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution?          ☒ Yes   ☐ No

b.   Did you submit a request for administrative relief on Claim III?          ☒ Yes   ☐ No

c.   Did you appeal your request for relief on Claim III to the highest level?          ☒ Yes   ☐ No

d.   If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____

_____

If you assert more than three Claims, answer the questions listed above for each additional Claim on a separate page.

•   5

## E. REQUEST FOR RELIEF

State the relief you are seeking:

_Declaratory, Compensatory and Punitive damages in an_ amount _to be determined at trial._

_Defendants are sued in their individual capacities_

I declare under penalty of perjury that the foregoing is true and correct.

Executed on __Jan. 30, 2023__
            DATE                                   SIGNATURE OF PLAINTIFF

_____
(Name and title of paralegal, legal assistant, or other person who helped prepare this complaint)

_____
(Signature of attorney, if any)

_____
(Attorney's address & telephone number)

## ADDITIONAL PAGES

All questions must be answered concisely in the proper space on the form. If you need more space you may attach more pages, but you are strongly encouraged to limit your complaint to twenty-five pages. If you attach additional pages, be sure to identify which section of the complaint is being continued and number all pages. Remember, there is no need to attach exhibits to your complaint.

6

1   Name: BROOKS, II., WILLIE LEE

2   CDCR#: P16665

3   Institution: Mule Creek State Prison

4   Address: P.O. Box 409099

5   Ione, CA 95640

6   Cell: D18B-204

7

8

9

10  In re BROOKS,II., W (name)            ) CASE NO. _____

11        Petitioner,                     )

12              On Habeas Corpus          )

13              vs.                        )

14  PATRICK COVELLO      (Warden          )

15  of Institution); State of California, )

16        Respondent.                     )

17  _____ )

18

19

20

21

22

23

24

25

26

27

28

                                1

## TABLE OF AUTHORITIES

1
2
                                                                                   **Page(s)**

**Federal Cases**

*Allen v. Kramer*, (E.D. Cal., Aug. 17, 2016, No. 115CV01609DADMJSPC) 2016 WL 4613360 .................................................................................................................17

*Atkins v. Virginia* (2002) 536 U.S.……………………………………………………………304, 311

*Brown v. Plata*, (2011) 563 U.S. 493 ................................................................................ 16, 17

*Carranza v. Reams*, (D. Colo., May 11, 2020, No. 20-CV-00977-PAB) 2020 WL 2320174 ....17

*DeShaney v. Winnebago County Dept. of Social Services*, (1989) 489 U.S. 189 ......................16

*Estelle v. Gamble*, (1976) 429 U.S. 97 .......................................................................................16

*Farmer v. Brennan*, 511 U.S. 825 (1994)...................................................................... 16, 18, 19

*Fay v. Noia*, (1963) 372 U.S. 391.......................................................................................19, 20

*Harris v. Nelson*, (1969) 394 U.S. 286.......................................................................................19

*Helling v. McKinney*, (1993) 509 U.S. 25 .................................................................................16

*Hutto v. Finney*, (1978) 437 U.S. 678 .......................................................................................16

*Matter of Extradition of Toledo Manrique*, (N.D. Cal., Mar. 19, 2020, No. 19MJ71055MAG1TSH) 2020 WL 1307109 ........................................................... 17, 18

*Vega v. Semple*, (2d Cir., June 29, 2020, No. 18-3176-PR) 2020 WL 3494317.........................17

*Wilson v. Seiter*, (1991) 501 U.S. 294 .......................................................................................18

**State Cases**

*Abelleira v. District Court of Appeal*, (1941) 17 Cal.2d 280 .............................................23, 24

*Frias v. Superior Court*, (1975) 51 Cal.App.3d 919 .................................................................21

*Glendale City Employees' Assn., Inc. v. City of Glendale*, (1975) 15 Cal.3d 328 ...............22, 23

*Hill v. Dekalb Reg'l Youth Detention Ctr*, 40 F.3d 1176, 1887 (11th Cir. 1994)

*Hoptowit v. Ray* (1982) 682 F.2d 1237……………………………………………………… 1252-53

*In re Alcala*, (1990) 222 Cal.App.3d 345 [preliminary relief granted ...................................20, 21

*In re Coca*, (1978) 85 Cal.App.3d 493 .......................................................................................15

*In re Fields*, (1990) 51 Cal.3d 1063, fn. 2..................................................................................21

*In re Hudson*, (2006) 143 Cal.App.4th 1 ...................................................................................22

*In re Muszalski*, (1975) 52 Cal.App.3d 500 ...............................................................................22

*In re Newbern*, (1960) 53 Cal.2d 786 ........................................................................................21

*In re Thompson*, (1985) 172 Cal.App.3d 256 .............................................................................23

*In re William M.*, (1970) 3 Cal.3d 16 .........................................................................................21

*Ogo Associates v. City of Torrance*, (1974) 37 Cal.App.3d 830......................................22, 23, 24

*People v. Duvall*, (1995) 9 Cal.4th 464 .....................................................................................20

*People v. Romero*, (1994) 8 Cal.4th 728 ...............................................................................19, 20

3

1
2
3
4
5
6
7
8
9

Name: *BROOKS, II, WILLIE LEE*

CDCR#: *P16665*

Institution: *MCSP*

Address: *P.O. BOX 409099*

*Ione, CA 95640*

Cell: *D18B-204*

10  In re *BROOKS, II, W.* (name)

11              Petitioner,

12                    On Habeas Corpus

13                    vs.

14  *PATRICK COVELLO*   (Warden

15  of Institution); State of California,

16              Respondents

17

| | |
|---|---|
| CASE NO. _____ | |
| **EMERGENCY** | |
| **APPLICATION FOR IMMEDIATE RELEASE FROM CALIFORNIA STATE DEPARTMENT OF CORRECTION AND REHABILITATION CUSTODY DURING COVID-19 OUTBREAK** | |

18
19
20

Petitioner *Willie Lee Brooks, II* is in the Custody of the California Department of

21  Corrections and Rehabilitation (CDCR) following a California conviction. This petition,

22  however, challenges the conditions of Petitioner's confinement at *MCSP*, and is therefore

23  brought in the county wherein Petitioner is held. Petitioner challenges the conditions of his

24
25  present confinement because of CDCR's unconstitutional response to the unprecedented

26  outbreak of COVID-19 across all CDCR institutions, including at *MCSP*, subjecting him to

27
28

5

1    fatalities.[5] There are 3,120 active confirmed cases in CDCR prisoner population as of January

2    21, 2021.[6]

3                                          III.

4    Governor Gavin Newsom declared a state of emergency due to the pandemic on March

5    4, 2020.[7] The federal government declared a national emergency on March 13, 2020.[8]

6

7                                          IV.

8    According to the Centers for Disease Controls and Prevention (hereafter "CDC") the

9    people at higher risk of getting very sick from the virus include: (1) older adults[9] and (2) people

10

11   who have certain medical conditions such as obesity, hypertension, or Type Two diabetes.[10]

12   Certain medical conditions impacting the lungs also render one particularly vulnerable to illness

13   including asthma.[11] Further, individuals with pre-existing severe mental illness are among the

14   most vulnerable populations because of the stressful impact of the pandemic.[12]

15

16                                          V.

17   The Center for Disease Control and Prevention issued interim guidance for correctional

18   and detention facilities in late March 2020 due to the "unique challenges for control of COVID-

19

20

21   [5] See California Department of Public Health, COVID-19 by the numbers,
     https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/ncov2019.aspx <last accessed January 3, 2021.>
22   [6] https://www.cdcr.ca.gov/covid19/population-status-tracking/ <last accessed January 3, 2021.>
     [7] https://www.gov.ca.gov/2020/03/04/governor-newsom-declares-state-of-emergency-to-help-state-prepare-for-broader-
23   spread-of-covid-19/.
     [8]https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-
24   coronavirus-disease-covid-19-outbreak/ <last accessed March 16, 2020> .
     [9] Center for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-
25   adults.html <last accessed July 9, 2020.>
     [10] Center for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-
26   with-medical-conditions.html <last accessed July 9, 2020.>
     [11] Center for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-
27   with-medical-conditions.html <last accessed July 9, 2020.>
     [12] See Center for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/managing-
28   stress-anxiety.html <last accessed July 9, 2020>; American Medical Association,
     https://jamanetwork.com/journals/jamapsychiatry/fullarticle/2764227 <last accessed July 9, 2020.>

                                          7

- CDCR's guideline provides that all staff interacting with COVID-19 infected patients shall wear an N95 mask, eye protection, and when in direct contact gloves and gowns.[18]

4. (CDC) If the facility is housing individuals with confirmed COVID-19 as a cohort: Only individuals with laboratory-confirmed COVID-19 should be placed under medical isolation as a cohort. Cohorting should not occur between those with suspected COVID-19, with close contacts of individuals with confirmed or suspected COVID-19, or with those with undiagnosed respiratory infection who do not meet the criteria for suspected COVID-19.[19]

- CDCR's guideline states that if cohorting is essential, quarantine cohorts shall be as small as possible (2-4 persons).[20]

5. (CDC) Ensure that cohorted groups of people with confirmed COVID-19 wear masks whenever others (including staff) enter the isolation space. (Anyone who has trouble breathing, or is unconscious, incapacitated or otherwise unable to remove the mask without assistance should not wear a mask.)[21]

(No corresponding CDCR guideline.)

---

[18] See Covid-19: Interim Guidance for Health care and Public Health Providers https://www.cdcr.ca.gov/covid19/wp-content/uploads/sites/197/2021/01/COVID-19-Screening-and-Testing-Matrix-Final-21-01-08.pdf <last accessed January 19, 2021.>
[19] See Interim Guidance on Management of Coronavirus Disease 2019 in Correctional and Detention Facilities https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html <last accessed July 10, 2020.>
[20] See Covid-19: Interim Guidance for Health care and Public Health Providers https://www.cdcr.ca.gov/covid19/wp-content/uploads/sites/197/2021/01/COVID-19-Screening-and-Testing-Matrix-Final-21-01-08.pdf <last accessed January 19, 2021.>
[21] See Interim Guidance on Management of Coronavirus Disease 2019 in Correctional and Detention Facilities https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html <last accessed July 10, 2020.>

9

CDCR's guidelines for general population transfers are as follows:[27]

    • Advance authorization required by the Director, Health Care Services or designee.

    • The Intake Control Unit and HCPOP shall coordinate these moves and shall inform the receiving CEO and CME in advance.

    • All inmates and transportation staff shall wear an N95 mask during transfer.

    • Quarantine all new arrivals for 14 days.

    • Screen all new arrivals for COVID-19 upon arrival and then daily while in quarantine.

    • Test all new arrivals for COVID-19 within 24 hours, again on day 5 and again prior to release from quarantine (day 12-14).

    • May release inmates from quarantine after 14 days if asymptomatic and all COVID-19 tests are negative.

    • Inmates who are symptomatic and/or test positive during pre-transfer testing shall be isolated as per interim guidance.

CDCR's guidelines state further that (1) cohorts with different movement dates shall be separated; and (2) cohorts with different types of movement shall be separated, including those coming in from jails or transferring between institutions.

---

[27] See Covid-19: Interim Guidance for Health care and Public Health Providers https://www.cdcr.ca.gov/covid19/wp-content/uploads/sites/197/2021/01/COVID-19-Screening-and-Testing-Matrix-Final-21-01-08.pdf <last accessed January 19, 2021.>

11

## VI.

Petitioner suffers from underlying medical conditions that make him more vulnerable to the dangerous and deadly effects of COVID-19, and, if contracted, make him more likely to suffer more long-term and serious consequences. These underlying "co-morbidity" issues include:

*See Attached Medical Records, or to be provided during discovery.*

## VII.

Leading public health officials warned months ago that unless courts act immediately, the "epicenter of the pandemic will be jails and prisons."[31] "Prisons are epicenters for infectious diseases" because of higher levels of risk factors, poor ventilation, unsanitary conditions, and poor access to health care.[32] Specifically, in an urgent memo dated June 15, 2020, Amend at UCSF[33] and the UC Berkeley School of Public Health, whose experts toured San Quentin during the height of its Covid-19 outbreak, provided guidance on immediate actions needed to address the outbreak.[34]

Although focused on conditions at San Quentin, the authors of the Amend report believed that "most, if not all of these recommendations are important for all California Prisons

---

[31] Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. Times (Mar. 16, 2020), https://nyti.ms/3avcWX4 <last accessed July 9, 2020.>

[32] Stuart A. Kinner, et al., *Prisons and custodial settings are part of a comprehensive response to COVID-19*, The Lancet, Vol 5 April 2020, p. e188, https://www.thelancet.com/journals/lanpub/article/PIIS2468-2667(20)30058-X/fulltext <last accessed July 9, 2020.>

[33] Amend at UCSF is a health-focused correctional culture change program led by experts in medicine (geriatrics, infectious diseases, family medicine), public health, and correctional health and policy.

[34]https://amend.us/wp-content/uploads/2020/06/COVID19-Outbreak-SQ-Prison-6.15.2020.pdf <last accessed January 19, 2021, at p. 1>

13

1  70 nurses required and that they now anticipate these positions will be filled by the end of

2  March."[39]

3      Across all 35 prisons, only 77% of staff were tested (or were exempt because they

4  tested positive within the previous 90 days) during the weeks of December 6 and December 13,

5

6  and only 68.3% were tested the week of December 20. (This data does not account for staff

7  who did not test because they were out sick or on vacation.)[40]

8      CDCR and CCHCS logs documented 50 incidents of noncompliance with masking

9  requirements among medical staff and approximately 100 incidents among custody staff

10

11  between December 16 and December 29.[41]

12      Reports by CDCR's Office of the Inspector General issued from August to November

13  2020 identified significant deficiencies in COVID screening and PPE compliance in CDCR

14  facilities.[42]

15

16      Follow-up monitoring by the OIG through January 6, 2021 also showed significant

17  irregularities.[43] Out of 19 facilities studied, 12 showed less than full compliance with facial

18  covering requirements among staff and 16 showed less than full compliance with facial

19  covering requirements among incarcerated people with 7 facilities showing "significant

20  noncompliance" in the latter category. Follow-up monitoring by the OIG through January 6,

21

22

23

24  [39] *Id.* at pp. 19.
   [40] *Id.* at pp. 19-20.
   [41] *Id.* at pp. 21.

25  [42] See OIG Covid-19 Review Series Part 1 Screening and Part 2 Face Coverings and PPE https://www.oig.ca.gov/wp-
   content/uploads/2020/08/OIG-COVID-19-Review-Series-Part-1-Screening.pdf; https://www.oig.ca.gov/wp-

26  content/uploads/2020/10/OIG-COVID-19-Review-Series-Part-2-%E2%80%93-Face-Coverings-and-PPE.pdf;

27  https://www.oig.ca.gov/wp-content/uploads/2020/11/OIG-COVID-19-Review-Series-Fact-Sheet.pdf <last accessed January
   17, 2021.>

28  [43] See Exhibit 2 to Joint Case Management Statement, Plata v. Newsom, Case 01-cv-01351-JST (N.D.Cal.) Doc. # 3530,
   01/13/21.

15

IX.

On April 14, 2020, the California Department of Justice issued No. 2020-DLE-05 Information Bulletin: "COVID-19 and Statutory Authority Under Government Code Section 8658," which would permit CDCR, in an emergency, to remove or release prisoners during an outbreak.[46] But there is no procedure for an incarcerated person to initiate a request that the warden exercise his discretion to release under section 8658.[47]

X.

As of January 13, 2021, 2,945 incarcerated patients (at three CDCR facilities) had been offered the COVID-19 vaccination, with approximately 90% of those patients accepting the vaccine.[48] CDCR's total population is currently approximately 92,000 people.[49] As of the same date, 18,539 employees have been vaccinated, amounting to 30% of all CDCR and CCHCS employees statewide.[50] CDCR estimated that there were approximately 9,000 incarcerated people at heightened risk of serious complications or death if infected by the coronavirus due to advanced age or other comorbidities, yet the state had not yet allocated sufficient doses to vaccinate them, let alone the other 80,000+ people incarcerated in CDCR facilities.[51]

---

[46] CA Department of Justice, No. 2020-DLE-05 Information Bulletin: "COVID-19 and Statutory Authority Under Gov. Code, § 8658. https://oag.ca.gov/sites/all/files/agweb/pdfs/publications/2020-dle-05.pdf? <last accessed July 9, 2020.>
[47] Govt. Code, § 8658 provides: "In any case in which an emergency endangering the lives of inmates of a state, county, or city penal or correctional institution has occurred or is imminent, the person in charge of the institution may remove the inmates from the institution. He shall, if possible, remove them to a safe and convenient place and there confine them as long as may be necessary to avoid the danger, or, if that is not possible, may release them..."
[48] See Joint Case Management Statement, Plata v. Newsom, Case 01-cv-01351-JST (N.D. Cal.) Doc. #3530, 01/13/21 at p. 2.
[49] Id. at pp. 9.
[50] Id. at pp. 3.
[51] Id. at pp. 3.

17

XIII.

Petitioner is vulnerable to the health risks of COVID-19. Petitioner is ___65___ (age) years old, born ___Feb 13, 1957___ (date of birth).

The aforementioned factors, taken together with Petitioner's inability to effectively protect against the virus due to the current conditions of his continuing confinement, increase his likelihood of contracting COVID-19 and suffering serious illness or death.

XIV.

Petitioner has a viable re-entry plan if released from CDCR custody. (list reentry plans)

Transfer My Parole to Taxes, with My Common Law Wife; Get SSD, MediCal and Food-Stamps; and Look for work in Aerospace.

(family contacts)

Michelle Lowe - (806) 341-4424
Rosetta Edwards - (661) 269-3428

(job opportunities)

see attached vocational training/certificates earned.

(skills, prior job history, vocational training/certificates earned)

Petitioner moves to supplement the Petition with additional materials from his family detailing his re-entry plan; and materials from his C-file documenting his programming, training and disciplinary record to date.

19

1  (1,775 inmates) to allow for proper social distancing and COVID-19 safety protocols in the

2  170-year old, poorly ventilated prison. Petitioner here is similarly situated at

3  _Mule Creek S.P._ prison whereby his conditions of confinement are needlessly

4  exposing him to substantial risk of occurrence or reoccurrence of contraction of Covid-19.

5

6                              XVI.

7    Petitioner has no plain, speedy or adequate remedy at law except by extraordinary writ.

8    WHEREFORE, Petitioner respectfully requests that this court:

9

10   1.    Issue a writ of habeas immediately releasing Petitioner from custody; or order

11         Respondent to show cause why relief should not be granted; and

12   2.    Grant petitioner whatever further relief is deemed appropriate and in the interest

13         of justice.

14   The instant petition is based on the attached Memorandum of Points and Authorities and

15

16   referenced secondary sources.

17

18   Dated: _Jan 30, 2023_                    Respectfully submitted,

19

20

21                                            (Petitioner Signature)

22

23

24

25

26

27

28

"serious medical need," is one that "has been diagnosed by a physician as mandating treatment or…is so obvious that even a lay person would easily recognize the necessity of a doctor's attention."[61]

Reasonable physical safety of an inmate is fundamental to the 8th Amendment, requiring incarcerated persons "be furnished with the basic human needs, one of which is 'reasonable safety.'"[62] And the Supreme Court explicitly recognizes that the risk of contracting "serious contagious diseases" may constitute such an "unsafe, life-threatening condition" that it threatens "reasonable safety."[63] Moreover, "the placement of inmates in places to which infectious diseases could easily spread constitutes a constitutional violation."[64] Prison officials may not be "deliberately indifferent to the exposure of inmates to a serious communicable disease."[65]

The U.S. Supreme Court further ruled that if outside facilities are too remote or too inaccessible to handle emergencies promptly, then the prison must provide adequate facilities and staff to handle [the] emergencies within the prison.[66]

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."[67] And, "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and

---

[61] *Hill v. Dekalb* Reg'l Youth Detention Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994)

[62] *Helling, supra,* 509 U.S. 25, 33.

[63] *Helling, supra,* 509 U.S. 25, 33–34 (internal quotations omitted); see also *Hutto v. Finney* (1978) 437 U.S. 678, 682-685 [recognizing the need for a remedy where prisoners were crowded into cells and some had infectious diseases].

[64] *Hutto v. Finney, supra,* 437 U.S. 682.

[65] *Helling, supra,* 509 U.S. 25, 33.

[66] *Hoptowit v. Ray* (1982) 682 F.2d 1237, 1252-53.

[67] *DeShaney v. Winnebago County Dept. of Social Services* (1989) 489 U.S. 189, 199-200.

23

1   Petitioner's continued confinement given the system-wide COVID-19 outbreak in

2   CDCR poses dire health risks and constitutes an unreasonable risk of future harm violating the

3   constitutional protections of the Eighth Amendment and the California Constitution. Courts

4
    have found valid Eighth Amendment claims in cases like Petitioner's, involving contagious
5
6   disease or other significant health risks in carceral environments. [74] Courts acknowledge the

7   imminent harm posed by exposure to COVID-19 in carceral facilities.[75]

8   To establish an Eighth Amendment violation "based on a failure to prevent harm, the
9
    [petitioner] must [first] show that he is incarcerated under conditions posing a substantial risk of
10
11  serious harm."[76] In assessing the "substantial risk" outlined in the Eighth Amendment, courts

12  have considered "(1) whether a reasonable doctor or patient would perceive the medical need in

13  question as important and worthy of comment or treatment; (2) whether the medical condition

14
    significantly affects daily activities; and (3) the existence of chronic and substantial pain."[77]
15
16  Second, Petitioner must establish that prison officials demonstrated a "deliberate indifference"

17  to the health and safety of inmates.[78] This means that the prison official must "know that

18  inmates face a substantial risk of serious harm and disregard that risk by failing to take

19
    reasonable measures to abate it."[79] As the Supreme Court declared in *Farmer*, "acting or failing
20
21  to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the

22
    ---
23  [74] *Allen v. Kramer* (E.D. Cal., Aug. 17, 2016, No. 115CV01609DADMJSPC) 2016 WL 4613360, at *1, 11; *Vega v. Semple* (2d Cir., June 29, 2020, No. 18-3176-PR) 2020 WL 3494317.
    [75] See *Carranza v. Reams* (D. Colo., May 11, 2020, No. 20-CV-00977-PAB) 2020 WL 2320174; cf. *United States v.*
24  *Stephens* (S.D.N.Y., March 19, 2020, No. 15-CR-95 (AJN)) 2020 WL 1295155, *2 [finding changed circumstance in part based on realization, since March 6 order, unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic
25  became apparent since the Court set bail on March 6, 2020; concluding the obstacles COVID-19 poses to the preparation of the Defendant's defense constitutes a compelling reason for release under 18 U.S.C.A. § 3142(i) (West)]; *Matter of*
26  *Extradition of Toledo Manrique* (N.D. Cal., Mar. 19, 2020, No. 19MJ71055MAG1TSH) 2020 WL 1307109 ["The risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail."]
    [76] *Farmer*, *supra*, 511 U.S. 825, 834.
27  [77] Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003).
    [78] *Farmer*, *supra*, 511 U.S. 825, 834, quoting *Wilson v. Seiter* (1991) 501 U.S. 294, 302-303.
28  [79] *Farmer*, *supra*, 511 U.S. 825, 847.

25

habeas corpus. The United States Constitution admonishes that: "The Privilege of the Writ of Habeas Corpus shall not be suspended.'[86] *Harris v. Nelson*, emphasized the "scope and flexibility...to reach all manner of illegal detention" and noting the Great Writ's ability to "cut through barriers of form and procedural mazes."[87]

A "habeas corpus petition is an acceptable vehicle for a general declaration of the procedural rights of individuals detained"[88] under challenged procedures. Furthermore, "[h]abeas corpus is an appropriate vehicle to 'present issues related to the conditions of confinement in a state prison' and to vindicate 'the rights of prison inmates generally.'"[89]

The writ's "function has been to provide a prompt and efficacious remedy for whatever society deems to be intolerable restraints."[90] "Its root principle is that in a civilized society, government must always be accountable to the judiciary for a person's imprisonment: if the imprisonment cannot be shown to conform with the fundamental requirements of law, the individual is entitled to his immediate release."[91]

The manner in which the writ of habeas corpus has been employed to enhance the rights of prisoners similarly situated to the petitioner is illustrated *In re Rodriguez* (1975) 14 Cal.3d. 639. In that case, the Supreme Court issued a writ of habeas corpus directing the release of the petitioner, who had established a constitutional violation with respect to his term of imprisonment.[92] The court then went on to describe the procedure necessary to avoid the same

---

[86] U.S. Const. art. I, § 9, cl. 2.
[87] *Harris v. Nelson* (1969) 394 U.S. 286, 291.
[88] *In re Walters* (1975) 15 Cal.3d 738, 744, fn. 3; 38 accord, *Faucette v. Dunbar* (1967) 253 Cal.App.2d 338, 343.
[89] *In re Head* (1986) 42 Cal.3d 223, 226.
[90] *Fay v. Noia* (1963) 372 U.S. 391, 401–402 overruled in part by *Wainwright v. Sykes* (1977) 433 U.S. 72 abrogated by *Coleman v. Thompson* (1991) 501 U.S. 722.
[91] *Fay, supra*, 372 U.S. 391
[92] *In Re Rodriguez* (1975) 14 Cal.3d 656.

27

the requested relief fell outside the scope of the city's available administrative remedies, and the city's procedure was tailored for minor, individual grievances, not more complex and serious relief.[97]

Here, as in *Glendale*, CDCR's administrative process is inadequate to address Petitioner's request for release due to the COVID-19 outbreak. Petitioner will not benefit from CDCR's early release plan because he has more than 180 days left to serve on his term and he was convicted of a serious/violent felony offense. Petitioner is also unable to request release under the April 14, 2020 memorandum addressing discretion under Govt. Code section 8658. Administrative remedy is inadequate to release Petitioner.

Second, the exhaustion doctrine does not apply if seeking an administrative remedy would be futile.[98] Seeking a remedy is futile when the aggrieved party can positively state what the administrative agency's decision in his particular case would be.[99] Here, the relief sought—release—is not available because Petitioner is not eligible for parole under the June 16, 2020 early release plan, nor can he initiate a request for release under Government Code section 8658. As any available administrative remedy here would be futile, Petitioner need not exhaust administrative remedies.

**A. There is no plain, speedy or adequate remedy.**

CDCR's "grievance" review procedures do not provide anything approaching the "almost immediate response" touted by Respondent and would be futile as they can never result in the specific relief Petitioners seek—release from prison. CDCR has up to 60 calendar days to

---

[97] *Glendale City Employees' Assn., Inc.*, *supra*, 15 Cal.3d 328, 342–343; see also *In re Hudson*, *supra*, 143 Cal.App.4th at p. 7–8 (prisoner had exhausted his administrative remedies because there was no administrative process available to grant the relief sought).
[98] *In re Thompson* (1985) 172 Cal.App.3d 256, 263.
[99] *Ogo Associates*, *supra*, 37 Cal.App.3d 830, 834.

29

1

2          For the reasons stated, this court should issue an Order to Show Cause, directing the

3    state to show cause why Petitioner should not be released. Pending the outcome of the habeas

4    petition, the court should order the Respondent to release Petitioner immediately, and grant

5
     whatever further relief is appropriate and just.
6

7

8    DATED: *Jan 30, 2023*                              Respectfully submitted,

9

10

11

12                                          By: _____

13                                                (Petitioner signature)

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                            32

## Declaration

1

2

3      I am the petitioner in this action. I declare under penalty of perjury under the laws of

4  the State of California that the foregoing allegations and statements are true and correct,

5  except as to matters that are stated on my information and belief, and as to those matters, I

6  believe them to be true.

7      Executed on *Jan. 30, 2023* (today's date) at *Mule Creek*

8  (institution), California.

9

10

11                          (Petitioner signature)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PETITION FOR WRIT OF HABEAS CORPUS